Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ANAND ROY, derivatively on behalf of CHIPOTLE MEXICAN GRILL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BRIAN NICCOL, JOHN R. HARTUNG, ALBERT S. BALDOCCHI, MATTHEW A. CAREY, GREGG L. ENGLES, PATRICIA FILI-KRUSHEL, LAURA FUENTES, MAURICIO GUTIERREZ, ROBIN HICKENLOOPER, SCOTT MAW, and MARY WINSTON,<br><br>Defendants,<br><br>and<br><br>CHIPOTLE MEXICAN GRILL, INC.,<br><br>Nominal Defendant. | Case No.:<br><br><br><br>**DEMAND FOR JURY TRIAL**<br><br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

---

Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Anand Roy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Brian Niccol ("Niccol"), John R. Hartung ("Hartung"), Albert S. Baldocchi ("Baldocchi"), Matthew A. Carey ("Carey"), Gregg L. Engles ("Engles"), Patricia Fili-Krushel ("Fili-Krushel"), Laura Fuentes ("Fuentes"), Mauricio Gutierrez ("Gutierrez"), Robin Hickenlooper ("Hickenlooper"), Scott Maw ("Maw"), and Mary Winston ("Winston") (collectively, the "Individual Defendants," and together with Chipotle, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Chipotle, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Niccol and Hartung for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Chipotle, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 8, 2024 through October 29, 2024,

inclusive (the "Relevant Period").

2.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's portion sizes were inconsistent and left numerous customers dissatisfied with Chipotle's offerings; and (2) to address the issue and keep its customers' loyalty, Chipotle would have to ensure more generous portion sizes, which would increase cost of sales. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

3.      The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

4.      In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Chipotle to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations.

5.      Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while four of the Individual Defendants engaged in improper insider sales, netting combined total proceeds of ***over $31.6 million***.

6.      The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

7.      In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States

Verified Shareholder Derivative Complaint

District Court for the Central District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

8. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

9. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Niccol's and Defendant Hartung's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

11. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12. This derivative action is not a collusive action to confer jurisdiction on a court

of the United States that it would not otherwise have.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Chipotle is headquartered in this District.

## PARTIES

### Plaintiff

14.     Plaintiff is a current shareholder of Chipotle. Plaintiff has continuously held Chipotle common stock at all relevant times.

### Nominal Defendant Chipotle

15.     Chipotle is a Delaware corporation with principal executive offices at 610 Newport Center Drive, Suite 1100, Newport Beach, CA 92660. Chipotle's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CMG."

### Defendant Niccol

16.     Defendant Niccol served as Chipotle's CEO and as a Company director from March 2018 until he left the Company effective August 31, 2024. He also served as Chairman of the Board from March 2020 until his departure.

17.     For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Niccol received $22,473,427 in total compensation from the Company. This included $1,292,308 in salary, $9,300,795 in stock awards, $6,200,364 in option awards, $5,200,000 in non-equity incentive plan compensation, and $479,961 in all other compensation.

18.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Niccol made the following sales of Company common stock:

| Date | Number of | Avg. Price/ | Proceeds ($) |
| --- | --- | --- | --- |

| | Shares | Share ($) | |
|---|---|---|---|
| 2024-04-26 | 320,300 | $63.73 | $20,413,840 |

Thus, in total, before the fraud was exposed, Defendant Niccol sold 320,300 shares of Company stock on inside information, for which he received approximately $20.4 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

19. The 2024 Proxy Statement stated the following about Defendant Niccol:

**Background:**

Mr. Niccol has served as our Chief Executive Officer and a director since March 2018 and in the additional role as Chairman of the Board since March 2020. From January 2015 to February 2018, Mr. Niccol served as Chief Executive Officer of Taco Bell, a division of Yum! Brands, Inc., a global restaurant company. He joined Taco Bell in 2011 as Chief Marketing and Innovation Officer and served as President from 2013 to 2014. Prior to his service at Taco Bell, from 2005 to 2011 he served in various executive positions at Pizza Hut, another division of Yum! Brands, including General Manager and Chief Marketing Officer. Before joining Yum! Brands, Mr. Niccol spent 10 years at Procter & Gamble Co., serving in various brand management positions. Mr. Niccol serves on the Board of Directors of KB Home (until April 18, 2024), one of the largest homebuilders in the U.S., and Chipotle Cultivate Foundation, Chipotle's nonprofit organization. He previously served on the Board of Harley-Davidson, Inc. Mr. Niccol holds an undergraduate degree from Miami University and an MBA from the University of Chicago Booth School of Business.

**Qualifications:**

Mr. Niccol brings us extensive experience in brand management, executive leadership, marketing and operations, as well as a proven track record of driving outstanding results at multiple restaurant brands. He also adds to the Board's experience in corporate governance and public company oversight.

**Defendant Hartung**

20. Defendant Hartung has served as the Company's President and Chief Strategy Officer since October 1, 2024 and previously served as the Company's CFO from 2002 to October 1, 2024.

Verified Shareholder Derivative Complaint

21.    For the 2023 Fiscal Year, Defendant Hartung received $8,383,282 in total compensation from the Company. This included $865,000 in salary, $3,300,593 in stock awards, $2,200,112 in option awards, $1,903,000 in non-equity incentive plan compensation, and $114,577 in all other compensation.

22.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hartung made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| 2024-06-13 | 123,050 | $64.98 | $7,995,808 |

Thus, in total, before the fraud was exposed, Defendant Hartung sold 123,050 shares of Company stock on inside information, for which he received approximately $8 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23.    The 2024 Proxy Statement stated the following about Defendant Hartung:

**John R. (Jack) Hartung**, 66, serves as our Chief Financial and Administrative Officer and has served as our Chief Financial Officer since 2002. In addition to having responsibility for all of our financial, reporting, tax and investor relations functions, Mr. Hartung also oversees strategy, supply chain and safety & asset protection. He joined Chipotle after spending 18 years at McDonald's Corp., a quick serve restaurant company, where he held a variety of management positions, most recently as Vice President and Chief Financial Officer of its Partner Brands Group. Mr. Hartung serves on the Board of Directors of The Honest Company, a consumer products company, and ZocDoc, Inc., a private company that runs an online medical and dental referral and appointment service, and also serves on the Audit Committee of both companies. Mr. Hartung has a Bachelor of Science degree in accounting and economics as well as an MBA from Illinois State University.

**Defendant Baldocchi**

24.     Defendant Baldocchi has served as a Company director since 1997. He also serves as a member of the Nominating and Corporate Governance Committee.

25.     For the 2023 Fiscal Year, Defendant Baldocchi received $336,080 in total compensation from the Company. This included $120,000 in fees earned or paid in cash and $216,079 in stock awards.

26.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Baldocchi made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| 2024-04-26 | 50,000 | $63.30 | $3,165,174 |

Thus, in total, before the fraud was exposed, Defendant Baldocchi sold 50,000 shares of Company stock on inside information, for which he received approximately $3,165,174 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

27.     The 2024 Proxy Statement stated the following about Defendant Baldocchi:

**Background:**
Mr. Baldocchi has been self-employed since 2000 as a financial consultant and strategic advisor for, and investor in, a variety of privately held companies. He holds a Bachelor of Science degree in Chemical Engineering from the University of California at Berkeley and an MBA from Stanford University.

**Qualifications:**
Mr. Baldocchi's extensive involvement with restaurant companies for almost 30 years has given him an in-depth knowledge of restaurant company finance, operations and strategy. He also has considerable experience with high-growth companies in the restaurant industry and in other industries, and his experience as a senior investment banker at a number of prominent institutions, including Morgan Stanley, Solomon Brothers and Montgomery Securities, helped him develop solid capabilities in accounting and finance as

well.

**Defendant Carey**

28.    Defendant Carey has served as a Company director since 2021. He also serves as a member of the Audit and Risk Committee ("Audit Committee").

29.    For the 2023 Fiscal Year, Defendant Carey received $341,080 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $216,079 in stock awards.

30.    The 2024 Proxy Statement stated the following about Defendant Carey:

**Background:**

Mr. Carey has served as the Executive Vice President of Customer Experience of The Home Depot, Inc., a home improvement retailer, since April 2022, and previously served as Executive Vice President and Chief Information Officer of The Home Depot since September 2008. Prior to that, Mr. Carey served as the Senior Vice President and Chief Technology Officer at eBay Inc. He also held various positions with Wal-Mart Stores, Inc., with his final role as Senior Vice President and Chief Technology Officer. Mr. Carey has significant cybersecurity expertise through his current and prior positions as the chief technology officer of large retail companies. He previously served as a member of the Board of Directors of Geeknet Inc. and TransUnion Corp. Mr. Carey received an Associate of Applied Science degree from Oklahoma State University-Okmulgee.

**Qualifications:**

Mr. Carey has significant operational and strategic leadership experience and also brings to our Board extensive experience with information technology, cybersecurity and managing a global retail environment.

**Defendant Engles**

31.    Defendant Engles has served as a Company director since 2020. He also serves as a member of the Nominating and Corporate Governance Committee.

32.    For the 2023 Fiscal Year, Defendant Engles received $341,080 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $216,079 in stock awards.

33.    The 2024 Proxy Statement stated the following about Defendant Engles:

Verified Shareholder Derivative Complaint

**Background:**

Mr. Engles is the Founder and Managing Partner of Capitol Peak Partners LLC, a capital investment company, since April 2017. He also serves as Chairman of Borden Dairy Company, a dairy company, and served as its Chief Executive Officer from July 2020 to November 2022. Mr. Engles previously served as the Chairman of the Board of Directors and Chief Executive Officer of The WhiteWave Foods Company, a global food and beverage company, from October 2012 until April 2017 when it was acquired by Danone S.A. He previously served as Chairman of the Board of Directors and Chief Executive Officer of Dean Foods Company, a food and beverage company and former parent company of WhiteWave, from April 1996 until WhiteWave's initial public offering in October 2012. Mr. Engles currently serves on the Board of Directors of Liberty Broadband Corporation and he previously served on the Boards of Directors of Danone S.A., The WhiteWave Foods Company (until it was acquired by Danone S.A.), GCI Liberty (until it merged into Liberty Broadband Corporation), Liberty Expedia Holdings, Inc., and Dartmouth College. He received a Bachelor's degree in Economics from Dartmouth College and a Juris Doctorate from Yale University.

**Qualifications:**

Mr. Engles has significant operational, strategic leadership and Board experience gained through his senior leadership positions at WhiteWave and other large public companies. He provides our Board with executive leadership perspective on the operations and management of public companies, which will assist our Board in evaluating strategic opportunities.

### **Defendant Fili-Krushel**

34.    Defendant Fili-Krushel has served as a Company director since 2019. She also serves as Chair of the Compensation, People and Culture Committee ("Compensation Committee").

35.    For the 2023 Fiscal Year, Defendant Fili-Krushel received $363,580 in total compensation from the Company. This included $147,500 in fees earned or paid in cash and $216,079 in stock awards.

36.    The 2024 Proxy Statement stated the following about Defendant Fili-Krushel:

**Background:**

Ms. Fili-Krushel served as Chief Executive Officer of Coqual (formerly Center for Talent Innovation), a New York City–based think tank that focuses on global talent strategies, from January 2019 until February 2021. She currently serves as a director of Coqual and previously served as Chair of its Board of Directors. From 2011 to 2016, she served as an executive at Comcast Corporation, a global media and technology company; as Division Chairman, NBCUniversal News Group; and as Executive Vice President, NBCUniversal. Prior to that, Ms. Fili-Krushel served as Executive Vice President and Chief Administrative Officer of Time Warner Inc., a global media and entertainment company, from 2001 to 2011; as President & CEO, WebMD Health Division, of WebMD Health Corp., from 2000 to 2001; as President, ABC Television Network, and President, ABC Daytime, Disney-ABC Television Group, of The Walt Disney Company, a diversified worldwide entertainment company; and as Senior Vice President, Programming of Lifetime Entertainment Services, an entertainment and media company, from 1988 to 1992. She also serves as a director of Dollar General Corporation and Reddit, Inc. Ms. Fili-Krushel received a Bachelor's degree in Communications from Saint John's University, and an MBA from Fordham University.

**Qualifications:**

Ms. Fili-Krushel has extensive leadership, human resources and compensation experience and her contributions to the Board include broad experience in managing global businesses, developing business strategy, talent management and creating organizational cultures. She also brings experience serving on the boards of directors of other public companies.

### **Defendant Fuentes**

37.    Defendant Fuentes has served as a Company director since 2023. She also serves as a member of the Compensation Committee.

38.    For the 2023 Fiscal Year, Defendant Fuentes received $171,044 in total compensation from the Company. This included $21,247 in fees earned or paid in cash and $149,797 in stock awards.

39.    The 2024 Proxy Statement stated the following about Defendant Fuentes:

**Background:**

Ms. Fuentes is the Executive Vice President and Chief Human Resources Officer of Hilton Worldwide Holdings Inc., a role she's held since 2020. Prior to that, she held the position of Chief Talent and Diversity Officer

and several other executive roles at Hilton since joining the company in
2013. For six years, Ms. Fuentes served in various Corporate Strategy and
Human Resources roles at Capital One Financial Corporation. Before that,
she worked at McKinsey & Company advising clients across various
industries in their Madrid, New York, and Washington, D.C offices. She
serves as a board member for two nonprofit organizations, Make-a-Wish
Mid-Atlantic and Arlington Free Clinic. Additionally, she represents
Hilton on the Tent US Advisory Council for refugees and serves on the
board for the University of Virginia McIntire School of Commerce.

Originally from Spain, Ms. Fuentes holds a Bachelor of Science from the
University of Virginia, a Masters of Science in Structural Engineering
from the University of Texas at Austin and an MBA from Columbia
University.

**Qualifications:**

Ms. Fuentes brings to the Board broad global people leadership experience
and a deep understanding of the global hospitality industry. She also has
extensive experience with strategic planning, leading a senior management
team and creating an international organizational culture.

### **Defendant Gutierrez**

40.    Defendant Gutierrez has served as a Company director since 2021. He also
serves as a member of the Compensation Committee.

41.    For the 2023 Fiscal Year, Defendant Gutierrez received $341,079 in total
compensation from the Company. This included $125,000 in fees earned or paid in cash
and $216,079 in stock awards.

42.    The 2024 Proxy Statement stated the following about Defendant Gutierrez:

**Background:**

Mr. Gutierrez served as President and Chief Executive Officer of NRG
Energy, Inc., an integrated power company, from December 2015 to
November 2023. He joined NRG in August 2004 and served in multiple
executive positions within NRG, including Executive Vice President and
Chief Operating Officer of NRG from July 2010 to December 2015;
Executive Vice President–Commercial Operations from January 2009 to
July 2010; and Senior Vice President–Commercial Operations from March
2008 to January 2009. Mr. Gutierrez also served as the Interim President
and Chief Executive Officer of Clearway Energy, Inc. (formerly NRG

Yield, Inc.), an energy infrastructure investor and owner that was spun off from NRG Energy in 2015, from December 2015 to May 2016, and Executive Vice President and Chief Operating Officer of Clearway from December 2012 to December 2015. Mr. Gutierrez held various positions within Dynegy's commercial and trading organization and Mexico City-based DTP Consultores. He serves as a member of the Boards of Directors of Electric Power Supply Association (EPSA), Chief Executives for Corporate Purpose (CECP) and Drexel University, and previously served on the board of NRG Energy, Inc. and Clearway Energy, Inc. Mr. Gutierrez holds a Bachelor's degree in Industrial Engineering from the Universidad Panamericana, a Master's Degree in Mineral Economics from the Colorado School of Mines and a Master's Degree in Petroleum Economics from the French Petroleum Institute.

**Qualifications:**

Mr. Gutierrez's experience as a chief executive officer brings to our Board management's perspective on leading day-to-day business operations. He also has extensive experience with strategic planning, leading a senior management team, risk management and environmental and sustainability issues.

**Defendant Hickenlooper**

43.     Defendant Hickenlooper has served as a Company director since 2016. She also serves as Chair of the Nominating and Corporate Governance Committee.

44.     For the 2023 Fiscal Year, Defendant Hickenlooper received $356,080 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $216,079 in stock awards.

45.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hickenlooper made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| 2024-09-12 | 1,790 | $56.38 | $100,923 |

Thus, in total, before the fraud was exposed, Defendant Hickenlooper sold 1,790 shares of Company stock on inside information, for which she received approximately $100,923 in

total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

46.    The 2024 Proxy Statement stated the following about Defendant Hickenlooper:

**Background:**

Ms. Hickenlooper is Senior Vice President of Corporate Development at Liberty Media Corporation, an owner of media, communications and entertainment businesses, and has served in senior corporate development roles at Liberty Media and its affiliates since 2010. Prior to joining Liberty Media in 2008, Ms. Hickenlooper worked at Del Monte Foods and in investment banking at Thomas Weisel Partners. Ms. Hickenlooper currently serves on the Board of Directors of Sirius XM Holdings Inc., and she previously served on the Board of Directors of FTD Companies, Inc. She earned a Bachelor's Degree in Public Policy from Duke University and an MBA from Kellogg School of Management at Northwestern University.

**Qualifications:**

Ms. Hickenlooper brings to the Board significant experience in marketing and new media, as well as public company corporate governance.

**Defendant Maw**

47.    Defendant Maw has served as a Company director since 2019. He also serves as Chairman of the Board and as a member of the Audit Committee and previously served as Lead Independent Director from May 2021 to November 2024.

48.    For the 2023 Fiscal Year, Defendant Maw received $418,580 in total compensation from the Company. This included $202,500 in fees earned or paid in cash and $216,079 in stock awards.

49.    The 2024 Proxy Statement stated the following about Defendant Maw:

**Background:**

Mr. Maw served as a Managing Director at WestRiver Group, a private equity investment firm, from August 2019 to August 2020 and as a Senior Advisor from August 2020 until February 2021. He was Executive Vice

President and Chief Financial Officer at Starbucks Corporation, a global roaster and retailer of specialty coffee, from 2014 until his retirement at the end of 2018. He also was Senior Vice President, Corporate Finance at Starbucks from 2012 to 2013, and Senior Vice President and Global Controller from 2011 to 2012. From 2010 to 2011, he was Senior Vice President and Chief Financial Officer of SeaBright Holdings, Inc., a specialty workers' compensation insurer. From 2008 to 2010, he was Senior Vice President and Chief Financial Officer of the Consumer Bank at JP Morgan Chase & Company. Prior to this, Mr. Maw held leadership positions in finance at Washington Mutual, Inc. from 2003 to 2008, and GE Capital from 1994 to 2003. Prior to joining GE Capital, Mr. Maw worked at KPMG's audit practice from 1990 to 1994. He currently serves as a member of the Boards of Directors of Avista Corporation and Alcon Inc. and serves on the Board of Trustees of Gonzaga University. He previously served on the Board of Directors of Root, Inc. Mr. Maw holds a Bachelor of Business Administration in Accounting from Gonzaga University.

**Qualifications:**

Mr. Maw brings to our Board expert knowledge in finance, accounting, risk management and public corporate governance and has extensive experience leading global teams.

**Defendant Winston**

50.     Defendant Winston has served as a Company director since 2020. She also serves as Chair of the Audit Committee.

51.     For the 2023 Fiscal Year, Defendant Winston received $341,080 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $216,079 in stock awards.

52.     The 2024 Proxy Statement stated the following about Defendant Winston:

**Background:**

Ms. Winston is the Founder and President of WinsCo Enterprises, Inc., a consulting firm providing financial and board governance advisory services since 2016. She served as interim Chief Executive Officer of Bed Bath & Beyond Inc., a retail chain, from May 2019 to November 2019, and as Executive Vice President and Chief Financial Officer of Family Dollar Stores, a leading discount retailer, from 2012 until it was acquired by Dollar Tree in 2015. Prior to that, Ms. Winston served as Senior Vice

President and Chief Financial Officer of Giant Eagle, Inc., a supermarket chain, from 2008 to 2012, and as Executive Vice President and Chief Financial Officer of Scholastic Corporation, a global children's publishing, education and media company, from 2004 to 2007. Ms. Winston currently serves on the Boards of Directors of Acuity Brands, Inc., TD Bank Group and Northrop Grumman Corporation. She also serves on the Boards of Directors of Toronto-Dominion Bank's U.S. subsidiary and Bechtler Museum of Modern Art. Ms. Winston previously served on the Boards of Directors of Dover Corporation, Bed, Bath & Beyond, Domtar Corporation, Plexus Corporation and Supervalu Inc. She holds a Bachelor's degree in Accounting from the University of Wisconsin, an MBA in Finance, Marketing and International Business from Northwestern University's Kellogg Graduate School, and is a CPA, as well as a National Association of Corporate Directors (NACD) Board Leadership Fellow.

**Qualifications:**

Ms. Winston brings us extensive experience and expertise from years of broad financial management and executive leadership experience, including serving as CFO of three large companies. She also brings to the Board valuable experience in risk oversight and capital allocation, executive compensation and general corporate governance matters.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

53.   By reason of their positions as officers, directors, and/or fiduciaries of Chipotle and because of their ability to control the business and corporate affairs of Chipotle, the Individual Defendants owed Chipotle and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Chipotle in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Chipotle and its shareholders so as to benefit all shareholders equally.

54.   Each director and officer of the Company owes to Chipotle and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

55.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Chipotle, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

56.    To discharge their duties, the officers and directors of Chipotle were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

57.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Chipotle, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

58.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to

disclose, so that the market price of the Company's Class A common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

59.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Chipotle were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Chipotle's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Chipotle conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Chipotle and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Chipotle's operations would comply with all applicable laws and Chipotle's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

Verified Shareholder Derivative Complaint

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

60.     Each of the Individual Defendants further owed to Chipotle and its shareholders the duty of loyalty requiring that each favor Chipotle's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

61.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Chipotle and were at all times acting within the course and scope of such agency.

62.     Because of their advisory, executive, managerial, directorial, and controlling positions with Chipotle, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

63.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Chipotle.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

64.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in

concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

65.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

66.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Chipotle was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

67.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

Verified Shareholder Derivative Complaint

68.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Chipotle and was at all times acting within the course and scope of such agency.

## CHIPOTLE'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### Chipotle's Code of Conduct

69.    Chipotle's Code of Ethics (the "Code of Conduct") states that it "applies to all Chipotle employees—full-time and part-time employees at every level of the company, all the way up to our executives—and our Board of Directors." The Code of Conduct represents that it "sets the standards for our behavior and decisions, which are governed by our values and reflect the laws and regulations that apply to our business." In addition, it states that "[t]he Code does not cover every law and policy that applies to us, but it gives us resources to help us make ethical decisions and deliver on our values."

70.    In a section titled "Personal Accountability," the Code of Conduct states:

To the rest of the world, the actions of each of us represent the actions of Chipotle. It is up to each of us to do our best to uphold the reputation of our brand. Our success depends on each of us being personally responsible to do the right thing.

Managers have an added responsibility to lead by example—this includes discussing the Code with your employees, reminding your employees that the Code must be followed, and responding promptly and fully to employee questions and concerns about the Code or ethical decision-making. Managers also must create an environment in which employees feel comfortable raising questions and reporting concerns.

71.    In a section titled "Securities & Insider Trading," the Code of Conduct states the following, in relevant part:

It is illegal to buy or sell securities while you are aware of material, nonpublic (or "inside") information that you know about because of your job with Chipotle. It also is illegal to share inside information with someone else who then buys or sells securities based on that information (called "tipping"). Information is considered material if it could affect Chipotle's stock price or a person's decision to buy or sell Chipotle stock. Material nonpublic information can be positive or negative and covers many different topics,

including unannounced financial results, changes in senior management, and information about Chipotle's suppliers or business partners.

Employees may not buy or sell Chipotle stock or any other security while they are aware of material, non-public information. If you are notified that you are covered by a restricted trading window or special no-trade period, you may not buy or sell Chipotle securities until the restriction has been lifted.

72.    In a section titled "Conflicts of Interest," the Code of Conduct states the following:

All employees are expected to avoid conduct that is competitive or damaging to Chipotle, such as using illegal business practices (for example, intentionally underpaying a supplier or wrongly reporting a delivery was short) or otherwise engaging in illegal or discriminatory activity in the course of your duties at Chipotle or otherwise engaging in conflicts of interest. A "conflict of interest" arises any time you have a personal or financial interest that results in competition with Chipotle, interferes with an employee's judgement concerning Chipotle's best interests, or exploits an employee's position with Chipotle for personal gain. We all have a duty to put Chipotle's interests before any personal interests whenever an opportunity arises.

Employees must disclose any actual or perceived conflicts of interest to their manager and the Ethics & Compliance Team, whether it involves them or another employee. Ethics & Compliance has the authority to deny requests if the actual or perceived conflict cannot be resolved. Situations involving a conflict of interest may not always be obvious or easy to resolve, so some of the more common scenarios you might encounter are described below. You should report actions that may involve a conflict of interest to your manager or another member of management as well as Ethics & Compliance. Failure to report an actual or perceived conflict may lead to disciplinary action or termination.

73.    In a section titled "Protecting Company Assets," the Code of Conduct states the following, in relevant part:

We provide the many tools you use to get our work done every day. We provide access to vehicles, equipment, use of facilities, ingredients, computers, mobile devices, software, paper products, cleaning supplies, uniforms, intellectual property and many other resources to enable you to succeed. We all have an obligation to use these company resources appropriately, legally and for Chipotle's benefit. We also have an obligation to report fraud, excessive waste and abuse of Chipotle's resources. Incidental

personal use of company property may be permitted on a limited basis, so long as such use is not against Chipotle's interests and does not interfere with Chipotle's business activities. For more information on this topic, refer to our Theft and Criminal Conduct Policy.

74.    In a section titled "Accurate Financial Reporting," the Code of Conduct states the following, in relevant part:

We are responsible for maintaining reliable financial records and disclosing accurate financial information on a periodic and timely basis to our shareholders, governmental agencies and others. Our financial records are created from data gathered across Chipotle, including documents like time sheets, purchase orders, inventory reports, expense reports, payroll records and travel and entertainment records. In order for our financial records to be accurate, each of these items must be accurate, complete and timely. You are required to follow all internal controls when recording information and submitting reports and must never falsify a document or record. Make sure you always record and classify transactions in the proper accounting period and in the proper account and department.

75.    In a section titled "Policy Modifications and Waivers," the Code of Conduct states:

We may modify the Code of Ethics from time to time to reflect changes in the law and our policies. The current version of the Code will be posted and maintained on our corporate website at https://ir.chipotle.com. Any waivers of the Code for any executive officer or any member of our Board of Directors must be approved by the Board of Directors or a Committee of the Board and the waiver will be disclosed as required by law.

76.    In a section titled "Reporting Code of Ethics Violations & Concerns," the Code of Conduct states the following, in relevant part:

If you believe the Code of Ethics has been violated or you believe a violation might occur, you have an obligation to promptly report what you know. You can report a suspected violation to:

• Your manager or another manager you feel comfortable speaking with, or the
head of your department or function
• Your People Experience partner or the Respectful Workplace Hotline team (formerly the RPE team)
• Any member of the Legal or Internal Audit departments

Verified Shareholder Derivative Complaint

• Chipotle's Ethics & Compliance Team, or

• Our confidential reporting hotline, Chipotle Confidential

Reports can be made 24/7 through **Chipotle Confidential** at **1-866-755-4449** or online at www.chipotleconfidential.com. You can report a violation anonymously and we will respect your confidentiality; however, we may not be able to fully investigate a report unless you identify yourself. If you do give your name, we will only share your identity with those people who need to know it in order to conduct a thorough investigation.

77.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Chipotle's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

### Chipotle's Audit Committee Charter

78.     Chipotle's Audit and Risk Committee Charter ("Audit Committee Charter") states that the purpose of the Audit Committee is as follows:

The Audit and Risk Committee (the "Committee") is a standing committee of the Board of Directors (the "Board") of Chipotle Mexican Grill, Inc. (the "Company"). The purpose of the Committee is to assist the Board in fulfilling its oversight responsibility relating to (i) the integrity of the Company's financial statements; (ii) the performance of the internal audit services function; (iii) the annual independent audit of the Company's financial statements, the engagement of the independent auditors and the evaluation of the independent auditors' qualifications, independence and performance; (iv) the compliance by the Company with legal and regulatory requirements; (v) the Company's evaluation of the Company's enterprise risks; and (vii) the fulfillment of the other responsibilities set out herein. The Committee shall

also prepare the report required to be included in the Company's annual proxy statement.

In discharging its responsibilities, the Committee is not itself responsible for the planning or conduct of audits or for any determination that the Company's financial statements are complete and accurate or in accordance with generally accepted accounting principles. This is the responsibility of management and the independent auditors. The Committee serves a Board-level oversight role in which it provides advice, counsel and direction to management and the independent auditors on the basis of information it receives, discussions with the independent auditors, and the experience of the Committee's members in business, financial and accounting matters.

79.    Regarding the Audit Committee's responsibilities with respect to "Oversight of Financial Statements and Internal Control over Financial Reporting," the Audit Committee Charter states the following:

F. *Oversight of Financial Statements and Internal Control over Financial Reporting.* The Committee is required to review, together with the independent auditors, the Company's critical accounting policies and the disclosure of them in "Management's Discussion and Analysis of Financial Condition and Results of Operations," any material or unusual accounting issues that require the exercise of a high degree of judgment regarding the appropriate treatment under generally accepted accounting principles, and the Company's overall system of internal control, including management's annual assessment of the Company's internal control over financial reporting and the related report issued by the independent auditors. The Committee shall also review with management and the independent auditors: (i) significant deficiencies and material weaknesses in the design or operation of the Company's internal control over financial reporting; (ii) any fraud (regardless of materiality) involving management or other employees having a significant role in internal control over financial reporting; and (iii) management's assessment of changes in the Company's internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, such internal control over financial reporting. The Committee shall discuss with the independent auditors the independent auditors' judgment about the quality, as well as the acceptability, of the accounting principles applied in the Company's financial reporting and shall review with the full Board any concerns about the quality or integrity of the Company's financial statements. The Committee shall also review and discuss with the independent auditors any critical audit matter

("CAM") addressed in the audit of the Company's financial statements and the relevant financial statement accounts and disclosures that relate to each CAM.

80.    The Audit Committee Charter states the following regarding the responsibilities of the Audit Committee with respect to review:

G. *Review of Disclosure Controls and Procedures.* The Committee shall review the Company's disclosure controls and procedures and management's conclusions about the effectiveness of such disclosure controls and procedures, including any material non-compliance with them.

H. *Review of Annual SEC Filings.* The Committee shall review with management and the independent auditors the financial information to be included in the Company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of the Form 10-K), including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall also discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under applicable standards of the PCAOB or applicable law or listing standards. Based on such review and discussion, the Committee shall determine whether to recommend to the Board that the audited financial statements be included in the Company's Form 10-K.

I. *Review of Quarterly SEC Filings.* The Committee shall review and discuss with management and the independent auditors the quarterly financial information to be included in the Company's Quarterly Reports on Form 10-Q, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and shall discuss any other matters required to be communicated to the Committee by the independent auditors under applicable standards of the PCAOB or applicable law or listing standards. The Committee shall also discuss the results of the independent auditors' review of the Company's quarterly financial information conducted in accordance with applicable standards of the PCAOB.

J. *Review of Certain Other Communications.* The Committee shall review the Company's earnings press releases and financial information and earnings guidance, including non-GAAP financial measures and the general types of financial information disclosed in presentations made to analysts and rating agencies.

K. *Review of Certain Matters with Management and the Independent Auditors.* The Committee shall review periodically with management and independent auditors (i) significant financial reporting issues, including material changes in the Company's selection or application of accounting principles and the effects of alternative applications of accounting principles on the Company's financial statements; and (ii) the effect of new or proposed regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements and other public disclosures.

81.    The Audit Committee Charter also listed the following responsibilities of the Audit Committee, in relevant part:

M. *Preparation of Report for Proxy Statement.* The Committee shall produce the report required to be included in the Company's annual proxy statement, all in accordance with applicable rules and regulations.

N. *Policies for Employment of Former Audit Staff.* The Committee shall approve guidelines for the Company's hiring of former employees of the independent auditors, which shall meet the requirements of applicable law and listing standards.

O. *Establishment of "Whistleblowing" Procedures.* The Committee shall establish and publish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

P. *Oversight of Legal Compliance and Ethics and Compliance Program.* The Committee shall oversee the Company's compliance with legal and regulatory requirements and oversee the Company's response to actual and alleged violations, including claims of harassment, discrimination or other violations of applicable employment laws. The Committee also shall oversee and evaluate the effectiveness of the Company's compliance program, including reports that involve actual and alleged violations of the Company's Code of Ethics. The Committee shall periodically (i) review and approve the Company's Code of Ethics and any waivers of such Code, (ii) monitor the performance of the "whistleblowing" procedures referred to above, and (iii) discuss the Company's ethical culture. In performing such oversight, the Committee also shall review with appropriate members of management, including the compliance officer, head of internal audit and, if appropriate, the

independent auditors any correspondence with, or other action by, regulators or governmental agencies and any employee complaints or published reports that raise concerns regarding the Company's financial statements, accounting or auditing matters, or compliance with applicable law or listing standards. The Committee also shall periodically discuss with the chief legal officer material legal affairs of the Company.

Q. *Oversight of Risk Assessment and Management Process*. The Committee shall review periodically and discuss with management the Company's significant and emerging risks, including financial risk exposures and operational, legal and regulatory risks, and the actions taken by the Company to monitor and mitigate such risks. The Committee also shall oversee and evaluate the implementation and effectiveness of the Company's risk assessment and risk management policies and procedures.

\*\*\*

X. *Access to Records, Consultants and Others.* In discharging its responsibilities, the Committee shall have full access to all books, records, facilities and personnel of the Company, and to request any officer or employee of the Company, the Company's outside counsel, internal auditor, internal audit service providers or independent auditors to attend a meeting of the Committee or to meet with any members of, or consultants, counsel, or other advisors to, the Committee.

Y. *Delegation.* The Committee may delegate any of its responsibilities to a subcommittee comprised of one or more members of the Committee.

Z. *Other Delegated Responsibilities.* The Committee shall also carry out such other duties that may be delegated to it by the Board from time to time.

82.   In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and

diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### False and Misleading Statements

#### *February 8, 2024 Form 10-K*

83. On February 8, 2024, Chipotle filed its annual report on Form 10-K with the SEC for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants Niccol, Hartung, Baldocchi, Carey, Engles, Fili-Krushel, Fuentes, Gutierrez, Hickenlooper, Maw, and Winston and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Niccol and Hartung attesting to the accuracy of the financial reporting, the disclosure of any material changes to Chipotle's internal control over financial reporting, and the disclosure of all fraud.

84. In its discussion of the Company's risk disclosures, the 2023 10-K stated the following, in relevant part:

> *The restaurant industry is highly competitive. If we are not able to compete successfully, our business, financial condition and results of operations would be adversely affected.*
>
> The restaurant industry is highly competitive with respect to taste preferences, price, food quality and selection, *customer service, brand reputation*, digital engagement, advertising and promotional initiatives, and the location, attractiveness and maintenance of restaurants. We also compete with non-traditional market participants, such as "convenience meals" in the form of entrées, side dishes or meal preparation kits from the deli or prepared foods sections of grocery stores, meal kit delivery services, and "ghost" or "dark" kitchens, where meals are prepared at separate takeaway premises rather than a restaurant. Increased competition could have an adverse effect on our sales, profitability and development plans. If guest or dietary preferences change, if our marketing efforts are unsuccessful, or if our restaurants are unable to compete successfully with other restaurant outlets, our business could be adversely affected.
> We continue to believe that our commitment to higher-quality and responsibly sourced ingredients resonates with guests and gives us a competitive

advantage; however, many of our competitors also make claims related to the quality of their ingredients and lack of artificial flavors, colors and preservatives. The increasing use of these claims by competitors, regardless of the accuracy of such claims, may lessen our differentiation and make it more difficult for us to compete. ***If we are unable to continue to maintain our distinctiveness and compete effectively, our business, financial condition and results of operations could be adversely affected***.[1]

85.    The 2023 10-K also included the following risk disclosure:

***If we do not continue to persuade guests of the benefits of paying higher prices for our higher-quality food, our sales and results of operations could be hurt***.

Our success depends in large part on our ability to persuade guests that food made with ingredients that were raised or grown according to our Food with Integrity principles are worth paying a higher price relative to prices of some of our competitors, particularly quick-service restaurants. Under our Food with Integrity principles, for example, animals must be responsibly raised, and the milk in our sour cream, cheese and queso must come from cows that have not been treated with rBGH, practices which typically are more costly than conventional farming. If we are not able to successfully persuade guests that consuming food made in accordance with our Food with Integrity principles is better for them and the environment, ***or if guests do not agree with the overall value proposition of our menu***, our sales could be adversely affected, which would negatively impact our results of operations.

***2024 Proxy Statement***

86.    On April 23, 2024, Chipotle filed the 2024 Proxy Statement with the SEC. Defendants Baldocchi, Carey, Engles, Fili-Krushel, Fuentes, Gutierrez, Hickenlooper, Maw, Niccol, and Winston solicited the 2024 Proxy Statement, which contained material misstatements and omissions.

87.    The 2024 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Baldocchi, Carey, Engles, Fili-Krushel, Fuentes, Gutierrez, Hickenlooper, Maw, Niccol, and Winston to the Board; (2) ratify the appointment of Ernst & Young LLP ("EY") as the Company's independent registered public accounting firm for the fiscal year

---

[1] All emphasis has been added unless otherwise noted herein.

Verified Shareholder Derivative Complaint

ended December 31, 2024; and (3) approve, on a non-binding advisory basis, the compensation of Chipotle's executive officers.

88.    Regarding the "Role of the Board of Directors in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

> While our executive officers and various other members of management are responsible for the day-to-day management of risk, the Board of Directors and its standing Committees oversee the significant risks facing our company. The responsibility for overseeing risks related to the following topical areas has been allocated to the Board and its Committees as follows:
>
> **Areas of Risk Oversight**
> **Board of Directors**
> •Our strategic plans, financial and operating performance and shareholder returns
> •Review and assess the effectiveness of our enterprise risk assessment and mitigation of critical risks, including regular reviews of our food safety, cybersecurity and privacy programs
> •Regular review and analysis with management of most significant business risks as identified by the Board, the Audit & Risk Committee, and/or management
> •Succession planning for our CEO and other executive officers and development of our senior management

89.    Regarding the Code of Conduct, the 2024 Proxy Statement stated the following:

> Our Board of Directors has adopted a number of policies to support our values and provide for good corporate governance, including our Corporate Governance Guidelines, which set forth our principles of corporate governance; our Board committee charters; and the Chipotle Mexican Grill, Inc. Code of Ethics, which applies to all Chipotle directors, executive officers and employees. Our Corporate Governance Guidelines and our Code of Ethics are available on the Investors page of our corporate website at ir.chipotle.com under Corporate Governance.
> If we make any substantive amendment to, or grant a waiver from, a provision of our Codes of Ethics that applies to our executive officers, we intend to satisfy the applicable SEC disclosure requirement by promptly disclosing the nature of the amendment or waiver on the Investors page of our corporate website at ir.chipotle.com under Corporate Governance.

90.    Defendants Baldocchi, Carey, Engles, Fili-Krushel, Fuentes, Gutierrez, Hickenlooper, Maw, Niccol, and Winston caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's portion sizes were inconsistent and left numerous customers dissatisfied with Chipotle's offerings; and (2) to address the issue and keep its customers' loyalty, Chipotle would have to ensure more generous portion sizes, which would increase cost of sales. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

91.    The 2024 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

92.    As a result of Defendants Baldocchi, Carey, Engles, Fili-Krushel, Fuentes, Gutierrez, Hickenlooper, Maw, Niccol, and Winston causing the 2024 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Baldocchi, Carey, Engles, Fili-Krushel, Fuentes, Gutierrez, Hickenlooper, Maw, Niccol, and Winston to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of EY as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2024; and (3) approve, on a non-binding advisory basis, the compensation of Chipotle's executive officers.

### *April 25, 2024 Form 10-Q*

93.    On April 25, 2024, Chipotle filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended March 31, 2024 (the "1Q24 10-Q"). The 1Q24 10-Q

was signed by Defendant Hartung and contained SOX certifications signed by Defendants Niccol and Hartung attesting to the accuracy of financial reporting, the disclosure of any material changes to Chipotle's internal control over financial reporting, and the disclosure of all fraud.

### *May 29, 2024 The Washington Post Article*

94.    On May 29, 2024, *The Washington Post* published an article titled "Chipotle portions haven't shrunk, company says after TikTok backlash." The article stated that there has been "***increasingly vocal online complaints in recent months from diners about the perceived stinginess of the burrito chain's portions***, once thought to be so generous that a crafty ordered could feed themselves for days from a single bowl." It continued by stating the following, in relevant part:

> ***But things took a turn when massively influential food reviewer Keith Lee echoed those laments*** – and added a few dings of his own – in a May 3 TikTok review.

> Lee, whose mild-mannered delivery and efforts to avoid getting special treatment have distinguished him from a sea of online food reviewers, wields considerable influence, even beyond his 16.3 million TikTok followers. (It's called the Keith Lee effect, and it's real.)

> "I used to love Chipotle," he said at the start of the segment, in which he ordered several menu items. "Lately, Chipotle has not hit the same, in my opinion." Things did not get better from there. ***He struggled to find bits of chicken in his bowl. "See, I don't see no chicken at all***," he said as dug around in disappointment, ultimately giving it a 2 out of 10 rating after locating a few lonely chunks. His formerly favorite steak quesadilla got a 2.5 ("tastes like Steak-umms").

> ***What made the criticism sting — and no doubt ring true to viewers — was that Lee was previously known to his followers as an enthusiastic Chipotle*** fan. He even collaborated with the brand last year, with Chipotle introducing a special menu item, the "Keithadilla," which was inspired by a custom order that Lee and fellow TikTok celebrity Alexis Frost had popularized in a viral video series.

* * *

*Chipotle, the virtual pile-on intensified. Some people called for users to register their displeasure with the company by leaving one-star reviews on its app*. Others took their grievances to their local locations, posting videos of themselves starting an order, but walking out of the restaurant midway if they thought the workers behind the counter were not doling out sufficiently generous scoops.

95.   The article highlighted that this consumer frustration with the Company was "playing out against a backdrop of customer frustration with rising food costs across the board: at the grocery store, in fast-food drive-throughs and at white-tablecloth restaurants."

96.   The statements referenced above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the Company's portion sizes were inconsistent and left numerous customers dissatisfied with Chipotle's offerings; and (2) to address the issue and keep its customers' loyalty, Chipotle would have to ensure more generous portion sizes, which would increase cost of sales. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Emerges**

97.   The truth began to emerge on July 24, 2024 when, after the market closed, the Company hosted an earnings call to discuss its financial results for the second quarter of 2024 ("2Q24") (the "2Q24 Earnings Call"). During the call, Defendant Niccol acknowledged that portion inconsistency was an issue at the Company and further stated the following, in relevant part:

*Before I give an update on our five key strategies, I want to take a minute to address the portion concerns that have been brought up in social media*. First, there was never a directive to provide less to our customers. Generous portion is a core brand equity of Chipotle. It always has been, and it always will be.

*With that said, getting the feedback caused us to relook at our execution across our entire system with the intention to always serve our guests delicious, fresh, custom burritos, and [bowls] with generous portions*.

To be more consistent across all 3,500 restaurants, we have focused in on those with outlier portion scores based on consumer surveys, and we are reemphasizing training and coaching around ensuring we are consistently making bowls and burritos correctly.

We have also leaned in and reemphasized generous portions across all of our restaurants as it is a core brand equity of Chipotle. Our guests expect this now more than ever, and we are committed to making this investment to reinforce that Chipotle stands for a generous amount of delicious, fresh food at fair prices for every customer, every visit.

The good news is that we are already beginning to see our actions positively reflected in our consumer scores and our value proposition remains very strong. We believe our focus on operations, including throughput as well as terrific marketing and menu innovation, have strengthened the brand and our value proposition. And we will continue to listen to and treasure our guests to earn every transaction.

98.    On this news, the price per share of Chipotle's stock fell $0.96 per share, or 1.85%, to close at $50.82 on July 25, 2024. It continued to fall an additional $0.99 per share, or 1.9%, to close at $49.83 on July 26, 2024.

99.    The truth fully emerged on October 29, 2024 when, after the market closed, Chipotle hosted an earnings call to discuss its financial results for the third quarter of 2024 ("3Q24") (the "3Q24 Earnings Call"). During the Call, interim CEO Scott Boatwright stated:

Cost of sales in the quarter were 30.6%, an increase of about 90 basis points from last year. The benefit of last year's menu price increase was more than offset by inflation across several items, most notably avocados and dairy, as well as higher usage as we focused on ensuring consistent and generous portions, and the mixed impact from our premium Smoked Brisket LTO.

100.    The following day, during market hours, *Business Insider* published an article titled "Chipotle says ensuring 'consistent and generous portions' has taken a toll on its

profitability," stating the following, in relevant part:

It has been a big year for the humble scoop – at Chipotle, at least.

*Profit margins for the chain suffered last quarter because of a concerted effort to provide "consistent and generous portions" in every order, the company said Tuesday*.

The issue was first highlighted when dissatisfied customers – protesting against what they saw as skimpy or inconsistent serving sizes at the restaurant chain – used social media this summer to complain about their scoops of protein and to try to maximize their meals.

Investors noticed, with one analyst going so far as to order 75 chicken and rice bowls from eight New York City Chipotle locations and finding that the total weight of each varied considerably.

*All the scrutiny has prompted the burrito and bowl chain to embark on an initiative to ensure everyone gets a consistent meal every visit*.

101.   The article also reported that, while ensuring the right portion might be "good news for Chipotle diners, *the chain said it was partly the reason for a hit to profitability in the last fiscal quarter.*"

102.   On this news, the Company's stock price fell $4.76 per share, or 7.86%, to close at $55.73 on October 30, 2024.

## DAMAGES TO CHIPOTLE

103.   As a direct and proximate result of the Individual Defendants' conduct, Chipotle has lost and will continue to lose and expend many millions of dollars.

104.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

105.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein,

and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

106. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

107. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

108. As a direct and proximate result of the Individual Defendants' conduct, Chipotle has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

109. Plaintiff brings this action derivatively and for the benefit of Chipotle to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Chipotle, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 10(b), 20(a), and 14(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

110. Chipotle is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

111. Plaintiff is, and has been at all relevant times, a shareholder of Chipotle. Plaintiff will adequately and fairly represent the interests of Chipotle in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

112. Plaintiff incorporates by reference and realleges each and every allegation

stated above as if fully set forth herein.

113.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Chipotle's Board consisted of the following ten individuals: Defendants Baldocchi, Carey, Engles, Fili-Krushel, Fuentes, Gutierrez, Hickenlooper, Maw, and Winston (the "Director-Defendants"), and non-party Scott Boatwright (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was filed.

114.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

115.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Chipotle to issue materially false and misleading statements. Specifically, the Director-Defendants caused Chipotle to issue false and misleading statements which were intended to make Chipotle appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

116.   Additional reasons that demand on Defendant Baldocchi is futile follow. Defendant Baldocchi has served as a Company director since 1997. He also serves as a member of the Nominating and Corporate Governance Committee. Defendant Baldocchi has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Baldocchi solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders voting to reelect Defendant Niccol and all

of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Baldocchi also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, also demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Baldocchi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117. Additional reasons that demand on Defendant Carey is futile follow. Defendant Carey has served as a Company director since 2021. He also serves as a member of the Audit Committee. Defendant Carey has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Carey solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders voting to reelect Defendant Niccol and all of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Carey also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Carey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118. Additional reasons that demand on Defendant Engles is futile follow. Defendant Engles has served as a Company director since 2020. He also serves as a

member of the Nominating and Corporate Governance Committee. Defendant Engles has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Engles solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders voting to reelect Defendant Niccol and all of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Engles also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Engles breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119. Additional reasons that demand on Defendant Fili-Krushel is futile follow. Defendant Fili-Krushel has served as a Company director since 2019. She also serves as Chair of the Compensation Committee. Defendant Fili-Krushel has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Fili-Krushel solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders voting to reelect Defendant Niccol and all of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Fili-Krushel also signed the false and misleading 2023 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Fili-Krushel breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

120.    Additional reasons that demand on Defendant Fuentes is futile follow. Defendant Fuentes has served as a Company director since 2023. She also serves as a member of the Compensation Committee. Defendant Fuentes has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Fuentes solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders voting to reelect Defendant Niccol and all of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Fuentes also signed the false and misleading 2023 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Fuentes breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

121.    Additional reasons that demand on Defendant Gutierrez is futile follow. Defendant Gutierrez has served as a Company director since 2021. He also serves as a member of the Compensation Committee. Defendant Gutierrez has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Gutierrez solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders voting to reelect Defendant Niccol and all of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Gutierrez also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gutierrez breached his fiduciary duties, faces a substantial likelihood of liability, is not independent

or disinterested, and thus demand upon him is futile and, therefore, excused.

122.    Additional reasons that demand on Defendant Hickenlooper is futile follow.
Defendant Hickenlooper has served as a Company director since 2016. She also serves as
Chair of the Nominating and Corporate Governance Committee. Defendant Hickenlooper
has received and continues to receive compensation for her role as a director as described
above. In addition, Defendant Hickenlooper solicited the false and misleading 2024 Proxy
Statement, which led to, *inter alia*, shareholders voting to reelect Defendant Niccol and all
of the Director-Defendants to the Board, thereby allowing them to continue breaching their
fiduciary duties to the Company. Defendant Hickenlooper also signed the false and
misleading 2023 10-K. As a trusted Company director, she conducted little, if any,
oversight of the scheme to cause the Company to make false and misleading statements,
consciously disregarded her duties to monitor internal controls over reporting and
engagement in the scheme, and consciously disregarded her duties to protect corporate
assets. In addition, her insider sales, made with knowledge of material nonpublic
information before the material misstatements and omissions were exposed, demonstrate
her motive in facilitating and participating in the scheme. For these reasons, Defendant
Hickenlooper breached her fiduciary duties, faces a substantial likelihood of liability, is
not independent or disinterested, and thus demand upon her is futile and, therefore,
excused.

123.    Additional reasons that demand on Defendant Maw is futile follow. Defendant
Maw has served as a Company director since 2019. He also serves as Chairman of the
Board and as a member of the Audit Committee and previously served as Lead Independent
Director from May 2021 to November 2024. Defendant Maw has received and continues
to receive compensation for his role as a director as described above. In addition, Defendant
Maw solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*,
shareholders voting to reelect Defendant Niccol and all of the Director-Defendants to the
Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

Defendant Maw also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Maw breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124.    Additional reasons that demand on Defendant Winston is futile follow. Defendant Winston has served as a Company director since 2020. She also serves as Chair of the Audit Committee. Defendant Winston has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Winston solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders voting to reelect Defendant Niccol and all of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Winston also signed the false and misleading 2023 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Winston breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

125.    Additional reasons that demand on the Board is futile follow.

126.    Defendants Maw, Carey, and Winston served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit

Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

127.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

128.   Chipotle has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Chipotle any part of the damages Chipotle suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

129.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's

charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

130.   The acts complained of herein constitute violations of fiduciary duties owed by Chipotle's officers and directors, and these acts are incapable of ratification.

131.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Chipotle. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Chipotle, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

132.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Chipotle to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

133.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with

disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

134.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

135.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

136.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

137.    Under the direction and watch of Defendants Baldocchi, Carey, Engles, Fili-Krushel, Fuentes, Gutierrez, Hickenlooper, Maw, Niccol, and Winston, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors were adhering to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading

statements.

138.    The 2024 Proxy Statement also failed to disclose that: (1) the Company's portion sizes were inconsistent and left numerous customers dissatisfied with Chipotle's offerings; and (2) to address the issue and keep its customers' loyalty, Chipotle would have to ensure more generous portion sizes, which would increase cost of sales. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

139.    In the exercise of reasonable care, Defendants Baldocchi, Carey, Engles, Fili-Krushel, Fuentes, Gutierrez, Hickenlooper, Maw, Niccol, and Winston should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to, the reelection of Defendants Baldocchi, Carey, Engles, Fili-Krushel, Fuentes, Gutierrez, Hickenlooper, Maw, Niccol, and Winston to the Board.

140.    As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders voted, *inter alia*, to reelect Defendants Baldocchi, Carey, Engles, Fili-Krushel, Fuentes, Gutierrez, Hickenlooper, Maw, Niccol, and Winston to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

141.    The Company was damaged as a result of the Defendants Baldocchi, Carey, Engles, Fili-Krushel, Fuentes, Gutierrez, Hickenlooper, Maw, Niccol, and Winston's material misrepresentations and omissions in the 2024 Proxy Statement.

142.    Plaintiff, on behalf of Chipotle, has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

143.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

144.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Chipotle. Not only is Chipotle now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Chipotle by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase hundreds of thousands of its own shares at artificially inflated prices, damaging Chipotle.

145.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

146.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Chipotle not misleading.

147.    The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore

Verified Shareholder Derivative Complaint

directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

148.   By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## THIRD CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

149.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.   The Individual Defendants, by virtue of their positions with Chipotle and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Chipotle and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Chipotle to engage in the illegal conduct and practices complained of herein.

151.   Plaintiff, on behalf of Chipotle, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

152.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Chipotle's business and affairs.

154.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

155.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their

fiduciary duties to protect the rights and interests of Chipotle.

156.    In breach of their fiduciary duties owed to Chipotle, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's portion sizes were inconsistent and left numerous customers dissatisfied with Chipotle's offerings; and (2) to address the issue and keep its customers' loyalty, Chipotle would have to ensure more generous portion sizes, which would increase cost of sales. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

157.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

158.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

159.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Chipotle's securities.

160.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls

were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Chipotle's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

161.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

162.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Chipotle has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

163.    Plaintiff, on behalf of Chipotle, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

164.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

165.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Chipotle.

166.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Chipotle that was tied to the performance or artificially inflated valuation of Chipotle, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

167.   Plaintiff, as a shareholder and a representative of Chipotle, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

168.   Plaintiff, on behalf of Chipotle, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

169.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Chipotle, for which they are legally responsible.

171.   As a direct and proximate result of the Individual Defendants' abuse of control, Chipotle has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

172.   Plaintiff, on behalf of Chipotle, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

173.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

174.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Chipotle in a manner consistent with the operations of a publicly held corporation.

175.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Chipotle has sustained and will

continue to sustain significant damages.

176.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

177.    Plaintiff, on behalf of Chipotle, has no adequate remedy at law.

## EIGHTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

180.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Chipotle to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

181.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

182.    Plaintiff, on behalf of Chipotle, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Niccol and Hartung for Contribution Under Sections 10(b) and 21D of the Exchange Act

183.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.    Chipotle, Defendant Niccol, and Defendant Hartung are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5

promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Niccol's and Defendant Hartung's willful and/or reckless violations of their obligations as officers and/or directors of Chipotle.

185. Defendants Niccol and Hartung, because of their positions of control and authority as former CEO and President/Chief Strategy Officer/former CFO of Chipotle, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Chipotle, including the wrongful acts complained of herein and in the Securities Class Action.

186. Accordingly, Defendants Niccol and Hartung are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

187. As such, Chipotle is entitled to receive all appropriate contribution or indemnification from Defendants Niccol and Hartung.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Chipotle, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Chipotle;

(c)    Determining and awarding to Chipotle the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Chipotle and the Individual Defendants to take all necessary actions to reform and improve Chipotle's corporate governance and internal procedures to

comply with applicable laws and to protect Chipotle and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

> 2. a provision to permit the shareholders of Chipotle to nominate at least five candidates for election to the Board;

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Chipotle restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: December 10, 2024                Respectfully submitted,

                                        **THE BROWN LAW FIRM, P.C.**

                                        /s/Robert C. Moest
                                        Robert C. Moest, Of Counsel, SBN 62166
                                        2530 Wilshire Boulevard, Second Floor
                                        Santa Monica, CA 90403
                                        Telephone: (310) 915-6628

Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I, Anand Roy, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10 day of December, 2024.

DocuSigned by:

*Anand Roy*

241669D16B9A4F5...

Anand Roy